IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SHAREEF CHILDS,

                                   Plaintiff,

              v.                                                      OPINION and ORDER

CHERYL WEBSTER, CRAIG LINDGREN, SR.,                                  22-cv-256-jdp
and STEVE MOHR,

                                   Defendants.[1]

---

Plaintiff Shareef Childs, without counsel, is a prisoner at Stanley Correctional Institution who is a practicing Muslim. Childs alleges that in 2022 defendant prison officials blocked him from participating in Ramadan meals and the Eid al-Fitr feast and that in 2023 they refused to give him correct prayer schedules for Ramadan. I granted Childs leave to proceed on claims under the Free Exercise Clause of the First Amendment to the United States Constitution and under the Religious Land Use and Institutionalized Persons Act. *See* Dkts. 14 and 38.

Currently before the court are a series of submissions, including defendants' motion for summary judgment. Dkt. 49. I will grant defendants' motion for summary judgment and dismiss the case in its entirety. The evidence shows that most of the deprivations were caused by errors by Childs and staff in navigating the procedures for religious observances. And I conclude that the First Amendment does not entitle Childs to printed prayer schedules at state expense.

---

[1] I have amended the caption to reflect defendants' full names as stated in their filings. Plaintiff Childs's first name is spelled "Shareff" in DOC records, but because Childs spells his first name "Shareef" in his filings I will use that spelling in this opinion.

PRELIMINARY MATTERS

Defendant Mohr died in December 2023. Childs filed a motion to substitute a successor as defendant, Dkt. 58, but the parties followed with a stipulation agreeing that the state would continue to defend Mohr and pay damages that may be awarded against him in this case, Dkt. 59. I will deny Childs's motion to substitute as moot.

Childs filed an unsigned motion for extension of time to submit a dispositive motion of his own, arguing that defendants refused to properly answer his discovery requests. Dkt. 47. After the clerk of court directed Childs to submit a signed copy, he followed with a new motion to strike defendants' motion for summary judgment and reset the dispositive motions deadline pending resolution of the parties' discovery disputes. Dkt. 56. But Childs did not file a formal motion to compel discovery as the court discussed in its preliminary pretrial conference order. Dkt. 20, at 11. ("If the parties do not bring discovery problems to the court's attention quickly, then they cannot complain that they ran out of time to get information that they needed for summary judgment or for trial."). So it is too late for him to amend the schedule to work out discovery disputes now. In any event, Childs has filed a voluminous response to defendants' motion for summary judgment, and the parties' filings make clear what facts they dispute. Regardless of Childs's failure to file a summary judgment motion of his own, I would consider entering judgment in his favor if it were appropriate to do so. I will deny his motions to amend the schedule.

There were a series of irregularities in the parties' summary judgment submissions that I must address. Defendants move to amend their proposed findings of fact to correct a mistake made in their original set of proposed findings. Dkt. 70. Defendants addressed Childs's claims about Ramadan meal accommodations in 2022 by submitting a prison policy about religious

2

meals dated as effective in January 2023, after the events at issue. *See* Dkt. 52-1. Defendants seek to amend their proposed findings citing this incorrect version of the policy and they have submitted the correct version of that policy, effective during the events at issue. *See* Dkt. 72-1. The relevant portions of the policies are identical. I will grant this motion and allow defendants to correct their mistake.

When Childs submitted his brief opposing defendants' summary judgment motion on his deadline for doing so, only a portion of his supporting materials arrived along with it. *See* Dkts. 61–65. Many of his exhibits arrived a couple of weeks later, even though the accompanying envelopes show that he placed those documents in the prison mail stream days in advance of his deadline. *See* Dkt. 74. It's unclear why this happened, although it is perhaps because Childs has been placing the incorrect zip code on his mailings to this court—for Childs's future reference the correct zip code is 53703. I will accept Childs's belatedly received materials and I will consider them in ruling on defendants' summary judgment motion.

Defendants move to amend their reply to their proposed findings of fact. Dkt. 76. They filed their original reply on their deadline for doing so, but Childs's exhibits in support of his opposition arrived after their reply. They seek to amend their reply in light of the information contained in those belatedly received exhibits. Childs opposes that request. But defendants are entitled to see Childs's opposition before replying. I will grant defendants' motion and accept their amended reply, Dkt. 77.

Despite my acceptance of Childs's belatedly received summary judgment opposition filings, there still appeared to be a part of his opposition missing. In his filings, Childs referred to his own proposed findings of fact (in a document labeled as "Exhibit 23") but those proposed findings did not initially appear on the docket. Instead, the docket entry labeled as Childs's

proposed findings, Dkt. 63, was a copy of Childs's responses to defendants' proposed findings of fact, a document already docketed at Dkt. 62. I asked the clerk of court to double-check the original hard copy of Childs's materials; we discovered that Dkt. 63 was entered in error, and that Childs had indeed included a copy of his proposed findings in his original mailing. I had the clerk's office docket those proposed findings as Dkt. 84.

Because the Wisconsin Department of Justice has agreed to waive service of hard copies of prisoners' submissions and instead rely on the electronically docketed copies of submissions, defendants did not see Childs's proposed findings before filing either their original or amended replies. Childs asks that his proposed findings be accepted as undisputed, Dkt. 78. I will deny that motion because defendants did not have an opportunity to respond to Childs's proposed findings. But I also won't ask defendants to file a response. It is clear from the parties' various submissions what facts they dispute. And so Childs is aware, because he is the party opposing summary judgment, I will resolve all factual disputes in his favor at this stage of the proceedings.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

A. Parties

Plaintiff Shareef Childs is a practicing Muslim who is incarcerated at Stanley Correctional Institution (SCI). Defendants all worked at that prison during the relevant events. Defendants Craig Lindgren, Sr. and Steven Mohr were chaplains. Defendant Cheryl Webster was a corrections program supervisor responsible for coordination and supervision of "specialized programs" at the prison, including religious services and activities.

4

**B.  2022 Ramadan meal bags**

Muslims participate in Ramadan, a holy month of fasting and prayer. During this month, observant Muslims fast from sunrise to sunset. In 2022, Ramadan began on April 2 and ended on May 1.

To accommodate the Ramadan fasting schedule, DOC prisons prepare meal bags that are delivered to inmates to consume after sunset and before sunrise. But inmates must sign up in advance for the meal bags. Division of Adult Institutions Policy and Procedure 309.61.03 governs how facilities administer multi-day religious fasting periods: each year, inmates must request an accommodation at least 60 days before the first meal in the special period, using a DOC-2935 form. Defendants state that it is important for inmates to submit their forms by that deadline so that SCI staff has enough time to prepare the meal plans.

Childs arrived at SCI in October 2021. Upon arrival he submitted a request—not on a DOC-2935 form—asking to be added to "all Islamic services." Defendant Webster interpreted this request as one to participate in Jumu'ah prayer services and Talim study group; Webster did not add Childs to the Ramadan meal group because that was done through a separate DOC-2935 form.

The deadline for inmates to sign up for Ramadan meal bags in 2022 was February 1. This deadline was posted in the chapel for months prior, announced numerous times at both the Jumu'ah prayer services and Talim study group sessions, and was stated in a memo. Childs didn't submit a DOC-2935 form by this date.

On February 10, Childs sent an email to the warden's office asking to be added to the Ramadan meal list. The warden's office emailed the request to defendant Chaplain Lindgren, who denied the request and told Childs to appeal to Webster. Webster also denied the request.

In early March, Childs sent Lindgren an email stating that he thought that selecting "Islam" as his Umbrella Religious Group when he arrived at SCI meant that he would be signed up for Ramadan meal bags, and that this is how those meals were handled at other DOC institutions where he had been incarcerated. Lindgren contacted the chaplain at one of those other locations, who denied that staff signed inmates up for Ramadan meal bags by any process other than the DOC-2935 form as outlined in DAI Policy and Procedure 309.61.03.

Nonetheless, Lindgren discussed Childs's situation with Webster. They concluded that Childs misunderstood the signup procedures and did not know that he was supposed to submit a DOC-2935 form. Webster decided to grant Childs an exemption from the rule and add him to the Ramadan meal list. Webster told the chapel inmate clerk to add Childs to the list. But Childs was not added to the list.

Childs received a meal bag the morning of the first day of Ramadan, Saturday April 2, 2022. But when he went to the officer's station to pick up his evening meal bag, he was told that he was not on the Ramadan list and so could not be given a meal bag. Childs sent defendant Lindgren an email about the problem, but both Lindgren and Webster weren't working that weekend and did not see the email until the following Monday. Childs did not receive either meal bag on Sunday or the pre-sunrise meal bag on Monday. Childs states that the lack of food caused him to be unable to properly focus or pray.

On Monday, Webster and Lindgren discussed Childs's email and added him to the Ramadan meal list. Childs began receiving meal bags that night.

## C. 2022 Eid al-Fitr celebratory meal

At the end of Ramadan, Muslims celebrate the end of the fast with a celebration called Eid al-Fitr. The DOC offers a congregate meal in the chapel area after prayer so that the

Ramadan participants can eat together as a group instead of on their separate units. The meal itself is the same meal served at the prison that day.

On April 26, 2022, defendant Chaplain Lindgren sent out a memo to all inmates who were on the Ramadan participant list asking them whether they wished to participate, and for the inmates to fill out, sign, and return the document to the chapel by April 28 if they wanted to participate in the Eid al-Fitr meal on May 2. Prison officials needed a few days lead time to properly set aside each participating inmate's meal to be served at the chapel instead of at the inmate's unit.

Childs states that on April 27 he placed the form to participate in the feast in the prison mail. Childs states that a few days later the form was returned to him with Lindgren's initials circled on it, leading him to think that Lindgren had signed him up for the feast. Lindgren disputes this, stating that he did not receive the memo back from Childs indicating that he wanted to sign up for the Eid al-Fitr meal, so he did not add Childs to the list. Lindgren states that when he received a completed form from an inmate, he would respond by sending a dated confirmatory letter with his initials; he would not have sent back the signup memo itself.

The Eid al-Fitr feast was held in the chapel the evening of May 2, 2022. About an hour before, a list of participating inmates was posted; Childs was not on that list. Childs notified staff that he had signed up for the feast. Staff called Lindgren at the chapel, but Lindgren denied Childs's request to attend.

Terry Jackson, another inmate on Childs's unit, was signed up to attend the feast. Childs asked Jackson to take Childs's completed and returned signup form to Lindgren. Jackson gave Lindgren the form. Lindgren states that the form "did not have a date stamp or any indications that it had been sent to or received by the Chapel." Dkt. 51 ¶ 25. Lindgren states that he gave

the document back to Jackson. Jackson submits a declaration stating that Lindgren kept the form. Neither side included the form in their summary judgment materials.

Lindgren called over to Childs's unit to tell staff that he had not received the form from Childs before the deadline, so there was no meal for Childs at the chapel, but that he was welcome to join the group for prayers beforehand. Childs came to the chapel for prayers but he did not eat a meal at the chapel. By the time Childs got back to his unit there wasn't a meal waiting there for him either. Childs says that he therefore didn't properly break his fast as required in Islam.

**D. 2023 Ramadan prayer schedules**

Muslims observe five prayer times each day, based on the time of day and position of the sun: (1) Fajr, between dawn and sunrise; (2) Zuhr or Dhuhr, beginning at noon time; (3) Asr, a mid-afternoon prayer when the sun is about two-thirds of the way in the sky; (4) Maghrib, beginning when the sun is setting; and (5) Isha, after the sunset. Each set of prayers takes several minutes, rarely more than ten.

It is important to know the timeframes for each prayer: Muslims are generally required to offer the prayers within their specific timeframes, otherwise the prayers will not be accepted. Many outlets publish prayer schedules to assist Muslims in knowing what time each prayer period starts. The times depend on the position of the sun, so to be accurate a schedule must be tailored to a person's location. At SCI, prison officials provided yearly prayer schedules to Muslim inmates as a courtesy. In January 2023, defendant Chaplain Lindgren distributed copies of the yearly prayer schedule to Muslim inmates. As part of preparations for Ramadan in 2023 (beginning March 23) defendant Webster distributed a memo to SCI staff explaining

the timing of Ramadan meal bags in relation to the Fajr and Maghrib prayer times and directing staff to use a prayer schedule that she had downloaded to an internal computer network drive.

Within the first few days of Ramadan, Childs and other inmates notified Lindgren that the prayer schedules that Lindgren had distributed to them were not accurate. Lindgren investigated and discovered that he had mistakenly provided the inmates with a schedule for Eau Claire instead of Stanley; Eau Claire is about 30 miles away. The parties dispute exactly how much the schedules differed; defendants say about two to three minutes and provide schedules from islamicfinder.org showing differences of two to four minutes in prayer times. *See* Dkts. 51-7 and 51-8. Childs says that the difference were as much as seven minutes, producing a schedule showing differences of as large as nine minutes. *See* Dkt. 74-22. The source of this schedule is unclear—it doesn't state a location or author—but I will infer that it was the schedule that Lindgren provided inmates in January 2023. Regardless, it's undisputed that Lindgren thought that he had mistakenly provided inmates with an Eau Claire schedule with a two-to-three minute difference from Stanley's schedule. Webster ordered the incorrect schedules to be removed from where they were posted.

Defendant Chaplains Lindgren and Mohr downloaded the correct schedule for Stanley and posted it on each wing of the units so that officers knew when to distribute Ramadan meal bags. The parties do not explain exactly what it means to post the schedules on each wing, but I take them to agree that this did not give inmates ready access to the schedule. There's no indication that the schedule that Webster had previously downloaded for officers' use was incorrect, but that schedule was never provided to inmates.

Lindgren emailed Fox Lake Correctional Institution Chaplain Daniel Coate about the problem with the schedules. Coate is a member of the DOC's Religious Practices Advisory

Committee and practicing Muslim. Lindgren stated that he had provided inmates with a schedule from Eau Claire that was off by two to three minutes, and that he believed that he had done so because Eau Claire "is the largest city in our vicinity." Dkt. 51-9, at 2. Coate responded that "if there is only a 2–3 minute difference in the prayer times, it shouldn't be an issue. No one should be praying or breaking their fast right at the time listed on the timetable." *Id.* at 1. Coate stated that Muslims shouldn't start their prayers right at the time listed on a schedule because schedules "are not 100% accurate" and clocks are not necessarily accurate about the time either. *Id.* Coates stated that he tells inmates to wait at least three to five minutes to ensure that their prayers are within the appropriate timeframe. *Id.* He finished by saying that "it is the responsibility of the individual to reach certainty that the time has entered." *Id.*

After the error was discovered, Lindgren and Mohr did not give inmates new courtesy copies of the correct Stanley schedule, even when asked by Childs and other inmates. When Childs filed grievances about being misled by incorrect prayer times, the institution complaint examiner told him that SCI staff would no longer provide courtesy copies of the schedules and that Chaplain Coate had stated that it is each inmate's responsibility to know when the correct prayer time is.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

I granted Childs leave to proceed on claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the Free Exercise Clause of the First Amendment regarding the following three events:

- Defendants Webster and Lindgren did not add Childs to the 2022 Ramadan meal list.

- Defendants Webster and Lindgren did not add Childs to the 2022 Eid al-Fitr feast list.

- Defendants Lindgren and Mohr refused to give him correct prayer schedules for Ramadan in 2023.

## A. Legal standards

To prevail on a First Amendment free exercise claim, a prisoner must show two things: the defendants imposed a "substantial burden" on his religious exercise; and (2) the burden was not reasonably related to a legitimate penological interest. *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019); *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). A substantial burden puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thompson*, 809 F.3d at 379.

RLUIPA prohibits correctional facilities receiving federal funds from imposing a substantial burden on a prisoner's religious exercise unless the burden is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)–(2).

I granted Childs leave to proceed on individual-capacity RLUIPA claims for damages against each of the defendants. I had allowed Childs to proceed on these claims after the Supreme Court's decision in *Tanzin v. Tanvir*, 592 U.S. 43 (2020), which I reasoned made "the availability of monetary damages in RLUIPA cases . . . an open question." Dkt. 14 at 5. But I later reconsidered that point, concluding that *Tanzin* didn't affect the precedential value of previous cases concluding that damages are unavailable under RLUIPA. *Russell v. Lange*, Case No. 22-cv-333-jdp, Dkt. 14 at 5 (W.D. Wis. Jan. 11, 2023); *see also Greene v. Teslik*, Case No. 21-2154, 2023 WL 2320767, at *2 (7th Cir. Mar. 2, 2023) (holding that "RLUIPA

11

authorizes only injunctive relief against state officials"). So I will dismiss Childs's RLUIPA damages claims and consider only his claims for injunctive relief.

## B.  2022 Ramadan meal bags

Childs alleges that defendants Corrections Program Supervisor Webster and Chaplain Lindgren failed to add Childs to the 2022 Ramadan meal list. It is undisputed that Childs did not receive four Ramadan meal bags over the first weekend of Ramadan in 2022 because he wasn't on the list for those meals. Defendants argue that this wasn't a substantial burden on his religious exercise because he was deprived of only four meals and inmates without meal bags may still make food purchases from the canteen or take at least some food from the cafeteria back to their cells. But Childs disputes that he had enough other food during this time, so for purposes of this opinion I will assume that his religious exercise was substantially burdened.

Nonetheless, I've previously concluded that in general the DOC's 60-day deadline for prisoners to sign up for Ramadan meals is the least restrictive means of achieving the DOC's compelling interests in orderly prison administration and cost control and thus violates neither RLUIPA nor the Free Exercise Clause. *See Williams v. Boughton*, No. 18-cv-934-jdp, 2020 WL 4464509, at *4 (W.D. Wis. Aug. 4, 2020) ("the 60-day deadline is reasonably related to the state's interest in having enough time to plan, budget for, and prepare religious meals"); *Dangerfield v. Ewing*, No. 18-cv-737-jdp, 2020 WL 94758, at *4 (W.D. Wis. Jan. 8, 2020). And the events that occurred here were the result of Childs's confusion over precisely how to sign up for Ramadan meal bags. Now that Childs is fully aware of the proper procedure—and Childs hasn't filed anything suggesting that signup was a problem in 2023 or this year's Ramadan, beginning March 10—there is no reason to think that he needs injunctive relief on this claim.

12

So I will grant summary judgment to defendants on Childs's RLUIPA claim regarding meal bags.

As for his First Amendment claim for damages regarding the 2022 meal bags, Childs contends that he did sign up for the list by telling prison officials when he arrived at SCI that he wanted to participate in "all" Islamic services. But under DOC policy, that wasn't the way inmates signed up for Ramadan meals each year. Instead, inmates had to submit a DOC-2935 form each year at least 60 days before the first say of Ramadan. Childs disputes that the original policy submitted by defendants was in place during Ramadan 2022 because it was dated effective January 2023. Defendants mistakenly submitted that version of the policy to the court, but they've fixed that mistake by submitting the correct version of the policy. In any event, both versions of the policy have the same requirement to fill out the DOC-2935 form.

Childs states that he was not required to use this form at other prisons; defendants dispute this fact. Although I must resolve this dispute in Childs's favor, the practice at other prisons loosening the DOC's official requirements to be placed on the Ramadan-meal list isn't enough to show that the SCI defendants violated his First Amendment rights. It's undisputed that SCI required the DOC-2935 form and informed inmates of that requirement. Childs's initial absence from the Ramadan list was caused by Childs's own failure to sign up using the DOC-2935 form.

Then, after Childs complained about not being on the list, Lindgren and Webster agreed to add him to the list due to Childs's confusion over how to properly sign up at SCI. Webster states that she told the inmate clerk to add Childs's name to the list. The clerk apparently did not add Childs's name to the list because Childs was denied his second through fifth meal bags over the weekend (it is unclear why Childs received the first one).

Childs argues that defendants' reliance on an inmate clerk violated the DAI 309.61.03 policy because under that policy the chaplain was tasked with compiling the list of inmates needing Ramadan meal bags. That's not what the policy actually says: it states that the chaplain or the chaplain's "designee" should compile the list. *See* Dkt. 72-1, at 7. But in any event, even had defendants violated the policy, that in itself does not violate the Constitution. *Langston v. Peters,* 100 F.3d 1235, 1238 (7th Cir. 1996). Defendants' use of an inmate clerk does not suggest that they intended to block Childs from practicing his religion.

Childs also argues that his omission from the list proves that Webster intentionally left him off the list after saying that she would add him. But the series of events in context do not allow for a reasonable inference that Webster intentionally left him off the list. When Lindgren and Webster returned to work on Monday, April 4, they received Childs's new complaint about being denied Ramadan meal bags over the weekend and discussed the complaint over email, with Lindgren stating the following: "Ms. Webster, Was this the inmate we discussed that requested to be added to all 'Services,' and we thought there may have been a misunderstanding and allowed him to join? I think it may have been. If so we can add him on." Dkt. 74-7, at 8 (edited for spelling). They immediately added Childs to the list and he began receiving meal bags. The only reasonable inference from this series of events is that Lindgren and Webster granted Childs an exemption from the DOC-2935 requirement and worked to place him on the list. Even if there was a mix-up in initially implementing Childs's exemption from the requirement that he use the DOC-2935 form, a jury couldn't reasonably infer that the delay was caused by intentional actions of Lindgren or Webster. *See Garner v. Muenchow,* 715 F. App'x 533, 536 (7th Cir. 2017) (Prison official's interference with religious practice must be "intentional[] and substantial[]"); *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010)

14

("negligence, even gross negligence, does not violate the Constitution"). So I will grant defendants' motion for summary judgment on Childs's First Amendment claim for damages regarding the 2022 meal bags.

## C. 2022 Eid al-Fitr celebratory meal

Childs alleges that defendants Webster and Lindgren did not add him to the 2022 Eid al-Fitr feast list. But the undisputed facts show that defendant Webster didn't play any role in this deprivation, so I will grant defendants' motion for summary judgment on the claims against her. And there is no indication that this problem carried over into the 2023 or 2024 Ramadan seasons, so I will dismiss Childs's RLUIPA claim for injunctive relief about the feast.

That leaves Childs's claim against defendant Chaplain Lindgren. There are significant disputes about the events surrounding Childs's participation in the 2022 feast. Childs says that he submitted the signup form and that it was returned to him with Lindgren's initials circled, indicating that Lindgren had received it. Lindgren states that he didn't receive a signup form and would not have returned the form to an inmate to confirm receipt; he would have sent a confirmatory letter instead. Neither party has put this form into the record, which each side saying that the other had retained it.

But even if I credit Childs's version of events, and assume that Lindgren did receive the completed form, initial it, send it back to Childs, but fail to put Childs on the Eid al-Fitr list, no reasonable jury could conclude that Lindgren intended to keep Childs off the list. Rather, placed in the proper context, Lindgren's failure to put Childs on the Eid al-Fitr list can only be regarded as an oversight in the handling of the request form. There's no reasonable way for a jury to infer that Lindgren intended to harm Childs's religious practice given that (1) he had already granted Childs an exemption for Ramadan meal bags a month earlier; and (2) he

15

ultimately invited Childs to come to the feast after inmate Jackson showed him Childs's signup form. Childs's belief that Lindgren meant to harm him is nothing more than mere speculation, which is not enough to defeat a motion for summary judgment. *See Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) ("[i]nferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors").

Childs did come to the feast for prayers but was unable to eat a meal with the other inmates because there were only enough meals for those who signed up. Although I can infer that the loss of a congregate meal did substantially burden Childs's religious practice, Lindgren's error in failing to include him on the list does not violate the First Amendment. *See Garner*, 715 F. App'x at 536; *McGowan*, 612 F.3d at 640. So I will grant defendants' motion for summary judgment on this claim.

## D. 2023 Ramadan prayer schedules

Childs alleges that defendant Chaplains Lindgren and Mohr refused to give him correct prayer schedules during Ramadan in 2023, leading to him being unable to pray at the correct times.

Defendants argue that the lack of a prayer schedule is no burden to inmates because, as DOC Muslim Chaplain Coate states, to avoid starting prayer early, Muslims commonly wait several minutes past the stated time on a schedule to account for the variability of clocks and a person's exact physical location in relation to the place posted on the schedule. But Childs states that he needs a prayer schedule because in a prison it is difficult to locate the position of the sun and because it is his personal belief that each prayer must start "on time" as soon as permitted, without delay. Dkt. 73, at 7. I will assume for purposes of this opinion that Childs's religious practice is substantially burdened by not having a schedule.

There are two parts to Childs's claims about the prayer schedules: (1) Lindgren initially provided inmates with incorrect copies of prayer schedules; and (2) after the mistake was discovered, Lindgren and Mohr refused to provide Muslim inmates with new, corrected schedules.

It is undisputed that Lindgren initially provided inmates with incorrect courtesy copies of prayer schedules with prayer times off by at least a couple of minutes that would render Childs unable to start his prayers on time. But there is no evidence in the record suggesting that this was anything other than a mistake by Lindgren, which is not enough to violate the Constitution. *See Garner*, 715 F. App'x at 536; *McGowan*, 612 F.3d at 640.

That still leaves defendants Lindgren's and Mohr's actions after the mistake was discovered. Lindgren and Mohr followed up by obtaining the correct schedule and posting them in each unit so that officers knew when to distribute the Ramadan meal bags. But it is undisputed that prison officials didn't give inmates copies of the new, correct schedule. Childs contends that this was a decision made or enforced by both Lindgren and Mohr. Defendants agree that Lindgren decided not to distribute new courtesy copies directly to inmates. And although defendants argue that Childs cannot prove that Mohr participated in these actions, Childs states that Mohr refused him a schedule too, which is enough to create a genuine dispute of material fact about Mohr's involvement.

But Childs's RLUIPA and First Amendment claims about this issue fail because he doesn't show that defendants were required to provide Muslim inmates with prayer schedules. Childs phrases defendants' conduct as "denying" him a prayer schedule, but that's not quite correct. Defendants didn't *prohibit* inmates from having prayer schedules; they just stopped giving inmates courtesy copies of the schedule after their mistake with the incorrect schedule.

17

Childs argues that prison policy required defendants to give inmates copies of the prayer schedule, citing a 2022 "Annual Religious Observance Congregate Meals" memorandum. Dkt. 74-31. That document mentions online prayer schedules in the context of prison staff providing Ramadan bag meals to inmates at the appropriate times; it does not say that staff are required to share those schedules with inmates. But even if it did, a violation of a prison policy is not itself a violation of the Constitution. *Langston*, 100 F.3d at 1238.

Neither RLUIPA nor the First Amendment requires prison officials to purchase religious materials for prisoners using government funds. *Cutter v. Wilkinson*, 544 U.S. 709, 720 n.8 (2005) ("Directed at obstructions institutional arrangements place on religious observances, RLUIPA does not require a State to pay for an inmate's devotional accessories."); *Henderson v. Frank*, 293 F. App'x 410, 413–14 (7th Cir. 2008)(correctional officials not required to purchase religious texts for Taoist inmate); *Kaufman v. Schneiter*, No. 07-C-45-C, 2007 WL 5613610, at *2 (W.D. Wis. Apr. 30, 2007) ("[T]he prison is not required under either RLUIPA or the free exercise clause to subsidize plaintiff's religious pursuits by purchasing religious reading material for him."). Defendants state that inmates were free to obtain those schedules from friends, family members, or prison religious volunteers. Another option that defendants do not mention but which seems obvious is that Muslim inmates could share the schedule among themselves. Childs doesn't provide facts showing that he could not use these methods to obtain prayer schedules, and given both the quality and quantity of his submissions in this and other lawsuits, I have no doubt that he is able to do so. And I note that Childs has not filed anything suggesting that he was unable to obtain prayer schedules for 2024's month of Ramadan that has just ended. For these reasons, I will grant summary judgment to defendants on Childs's RLUIPA claim for injunctive relief and almost all of his First Amendment claims for damages.

But that still leaves the immediate aftermath of the discovery of the inaccurate 2023 prayer schedules. Inmates had been accustomed to receiving courtesy copies of the prayer schedules, and then Lindgren and Mohr abruptly ended that practice, leaving Muslim inmates to scramble to obtain accurate schedules after Ramadan had already begun. The parties don't address Childs's damages claim in this amount of detail, but ending the practice of providing courtesy copies of the schedule without warning likely left Childs without recourse for at least a short time, thus substantially burdening his religious practice.

But even had Childs made this precise argument, I would reject it because defendants would be entitled to qualified immunity on this aspect of his First Amendment claims. Under the doctrine of qualified immunity, a plaintiff may not obtain damages for a constitutional violation against a public official unless the plaintiff shows that the official violated clearly established law. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 725 (7th Cir. 2013). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Childs bears the burden of demonstrating that his rights were clearly established to overcome qualified immunity. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011). He fails in that burden because he does not cite any authority—and I am unaware of any—clearly establishing that prison officials violate the Free Exercise Clause by choosing not

19

to provide religious materials to prisoners as a courtesy. Nor is there any controlling precedent regarding the provision of prayer schedules. So I will grant summary judgment to defendants on this aspect of Childs's First Amendment claims.

Because I am granting summary judgment to defendants on all of Childs's claims, I will dismiss the entire case and direct the clerk of court to enter judgment in defendants' favor.

ORDER

IT IS ORDERED that:

1. Plaintiff Shareef Childs's motion to substitute a successor for defendant Steven Mohr, Dkt. 58, is DENIED as moot.

2. Plaintiff's motions to amend the schedule, Dkts. 47 and 56, are DENIED.

3. Defendants' motion to amend their proposed findings of fact, Dkt. 70, is GRANTED.

4. Defendants' motion to amend their reply, Dkt. 76, is GRANTED.

5. Plaintiff's motion to deem his proposed findings of fact as undisputed, Dkt. 78, is DENIED.

6. Defendants' motion for summary judgment, Dkt. 49, is GRANTED.

7. The parties' remaining motions are DENIED.

8. The clerk of court is directed to enter judgment accordingly and close the case.

Entered April 12, 2024.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge